CITY OF SAN ANTONIO, Appellant,

v.

Gasper MENDOZA, Appellee.

No. 15336.

Court of Civil Appeals of Texas,
San Antonio.

Sept. 17, 1975.

Rehearing Denied Jan. 21, 1976.

Crawford B. Reeder, City Atty., Jane Haun Macon and Edgar A. Pfeil, Asst. City Attys., San Antonio, for appellant.

Leslie S. Mendelsohn, San Antonio, for appellee.

CADENA, Justice.

The City of San Antonio, defendant below, appeals from a judgment awarding plaintiff, Gasper Mendoza, $55,000.00, including $30,000.00 for impairment of future earning capacity, as compensation for injuries received by him when a tractor-mower which he was operating in discharge of his duties as a City employee burst into flames.

The answers to the special issues were as follows (the numbers in parentheses correspond to the numerical designation of the special issue embodying the finding preceding the parentheses):

a. City's failure to provide "preventive maintenance" for the wiring on the tractor mower (1) constituted negligence (2) proximately causing plaintiff's injuries (3).

b. City's act of providing plaintiff with a tractor which would permit gasoline to leak from the gas tank (4) was negligence (5) which proximately caused plaintiff's injuries (6).

c. City's failure to warn plaintiff that the gasoline cap on the equipment permitted gasoline to leak from the gasoline tank (7) constituted negligence (8) which was a proximate cause of plaintiff's injuries (9).

d. An issue (10) inquiring whether the wiring on the equipment was faulty was answered in the negative. Because of such negative answer, issues 10a, 11 and 12, relating to failure to warn, negligence and proximate cause, were not answered.

e. City failed to promulgate rules and regulations for the safety of its employees (13), but such failure, although constituting negligence (14), was not a proximate cause of plaintiff's injuries (15).

f. Plaintiff should recover $5,000.00 for past mental anguish (16a); $10,000.00 for future mental anguish (16b) and paid $30,-000.00 for loss of future earning capacity (16c); $7,500.00 for physical impairment and disfigurement (16d); and $2,500.00 for future medical expenses.

■ City's second point asserts that the trial court erred in submitting issue 1, inquiring whether City failed to provide preventive maintenance for the wiring, over City's timely objection that there were no pleadings to support the submission of such issue. We find no objection aimed specifically at the submission of issue 1 because of lack of pleadings. There is in the record an objection "to each one" of the issues on the ground that there is no evidence and no pleading "to support the submission of any one of plaintiff's issues No. 1 through the final one." Such an objection is too broad to be considered. *Monsanto Company v. Milam*, 494 S.W.2d 534, 537 (Tex.1973).

In its third point City argues that the trial court erred in overruling City's objection that "the charge . . . fails to inquire whether the condition [leaking gasoline tank cap] inquired about in primary negligence issues nos. 4 and 7 had existed long enough for the City to have knowledge of it and time to repair it. . . ."

█ This point purports to be based on paragraph 35 of City's motion for new trial. This assignment of error complains of the submission of issues 1, 4, 7 and 13 for eight different reasons. Thus, this one assignment of error complains of 32 different rulings. It is clearly multifarious and insufficient to preserve for appellate review the ruling complained of in point 3. *Biggers v. Continental Bus System*, 157 Tex. 351, 303 S.W.2d 359 (1957); *Tex.-Wash. Enterprises, Inc. v. Robna, Inc.*, 488 S.W.2d 504 (Tex.Civ.App.—Waco 1972, writ ref'd n. r. e.). Texas appellate courts have displayed an inclination to consider multifarious points of error in briefs where, from the statement and argument under such points, the gist of the complaint can be determined. But there has been no indulgence in such liberality in determining the sufficiency of assignments of error in motions for new trial. *Texas Indemnity Insurance Company v. Warner*, 159 S.W.2d 173, 179 (Tex.Civ. App.—Texarkana 1942, writ ref'd w. o. m.).

█ We agree with plaintiff that City's points 9 and 10, which raise the question of the sufficiency of the evidence to support the verdict, and the sufficiency of the pleadings, evidence and verdict to support the judgment are based on assignments of error in City's motion for new trial which are too general to justify our consideration of such points. However, point 8, which insists that there is insufficient evidence to support the jury's answers to the first nine issues is based on sufficient assignments of error in the motion for new trial. Further, the question of "no evidence" to support findings 1–9 was properly preserved by City's motion for judgment n. o. v. We will, therefore, consider the questions of factual and legal sufficiency of the evidence.

Plaintiff began working for City as a laborer on August 18, 1966, and was promoted to the position of equipment operator on May 4, 1968. On the date of the accident, July 24, 1968, plaintiff was a member of a weed-mowing crew, and his normal duties consisted of driving a truck. The actual mowing or cutting of weeds was done by other members of the crew, with plaintiff working ahead of the mowers, removing rocks and other objects which might interfere with proper operation of the mowing machines. On the day of the accident plaintiff performed such duties until noon. After lunch, because of the absence of one of the regular mower operators, plaintiff was directed by his foreman, Benito Vasquez, to operate one of the tractor mowers, identified in the record as mower no. 588. This equipment consisted of a tractor to the rear of which was attached the mowing machinery.

Prior to the day of his injury, plaintiff had occasionally operated a tractor-mower for a total of about five or six hours, but there is evidence to the effect that he was not "experienced" in the operation of such equipment. There is evidence to the effect that plaintiff received "on-the-job training" in the operation of such equipment, but plaintiff testified that he received no instructions, other than being cautioned about attempting to mow on inclines or slopes because of the danger that the mower might roll over. Plaintiff had never operated mower no. 588 before and did not know that gasoline leaked from the gasoline tank cap. No one told him of this danger, nor had he ever heard anyone mention the fact that any of the mowers leaked gasoline.

Plaintiff started the tractor and proceeded to drive to the area where he was supposed to mow. After he had been operating the mower for about 30 minutes he heard his foreman whistling. Looking back, he saw the foreman motioning for

him to "come back." He began backing up, looking to the rear to see where he was going and to make sure that the mowing equipment attached to the rear of the tractor remained in proper alignment. While backing up and looking to the rear, "all of a sudden he felt something on his legs." When he turned his head to the front he saw that the tractor was enveloped in flames. The terrain was rough and full of holes, and the nature of the terrain caused the tractor to shake and vibrate. The testimony is conflicting as to whether or not plaintiff, at the time he was called by the foreman, was attempting to mow on a slope or incline, but the testimony establishes that when the tractor burst into flames it was on level ground. Plaintiff testified that he did not know what caused the fire. He saw gasoline leaking from the gasoline tank cap, which was located to the front, and below the knees, of the person operating the tractor.

Another City employee testified that he had operated mower no. 588 on various occasions, the last time being some three months before plaintiff's accident, and that after the mower had been in operation for about 30 or 45 minutes it would begin to leak gasoline from the gasoline tank cap. Gasoline leaked from the bottom of the cap as well as from the "breather hole" on top of the cap. The last time he operated this mower he had to pour water on it because the wires were "smoking." He reported this incident to the foreman and also told the foreman that gasoline leaked from the gasoline tank cap.

A City employee who had operated the mower about a week before plaintiff's injury testified that when the mower was operated over rough terrain the gasoline tank cap would "get loose" and gasoline would leak.

Plaintiff's foreman, Vasquez, who had been a City employee for about seven years, testified that the mowers had been leaking gasoline ever since he had begun working for City, and that all mower operators complained of gasoline leakage. Some mowers

had been leaking gasoline for about six months before plaintiff was injured.

On the day plaintiff was injured mower no. 588 was about seven years old. The gasoline tank cap on such mowers is equipped with a gasket to insure that the tank cap fits snugly enough to prevent leakage of gasoline. Such gaskets could reasonably be expected to wear out in three or four years. When the gasket wore out, the cap would become loose and gasoline would leak from the cap.

City's repair and maintenance shops performed only "minor maintenance" on the mowers. This did not include changing gasoline tank caps or the gaskets on such caps. Other repairs and maintenance work on such tractors was performed at the shops of the San Antonio Transit System, pursuant to a contract between City and the Transit System. The Transit System did only such work on City equipment as was requested in writing by City. The Transit shop records reflect that although mower no. 588 had been taken to the Transit shops several times prior to plaintiff's injury, neither the gasoline tank cap nor the gasket had ever been changed. One of the City supervisors testified that it was the responsibility of the mower operators to insure that, after the tractor tank had been filled with gasoline, the cap was screwed back on tightly. The tractors were normally filled with gasoline in the morning, and there is no evidence that plaintiff was operating the tractor at the time of such refueling. There is also evidence to the effect that the mower operators were expected to check the caps and change them when necessary.

Plaintiff's foreman reported the accident to his own supervisor, as he was required to do, telling the supervisor that plaintiff was injured when sparks ignited gasoline which had leaked from the gasoline tank cap. The written report filed by the foreman's supervisor, in accordance with City rules, stated that plaintiff was injured when gasoline "suddenly ignited." In answer to written interrogatories, City listed "ignition of gasoline" as the cause of plaintiff's injuries.

There is evidence to the effect that plaintiff smoked cigarettes, but there is no hint in the record that plaintiff was smoking at any time while operating the mower.

■ The evidence is ample to support the finding that City furnished plaintiff a mower with a gasoline tank cap which would permit gasoline to leak (issue 4) and failed to warn him of such defect (issue 7).

■ City argues that a finding that the gasoline tank cap "would permit" gasoline to leak is not a finding that, on the occasion in question, gasoline did, in fact, leak from the cap. In this connection City states in its brief that, despite City's objection, the trial court failed to include in the charge an issue inquiring whether the cap was leaking at the time of the accident. City's brief does not refer us to that portion of the transcript in which the claimed defect was called to the attention of the trial court. Paragraph 27 of City's motion for new trial asserts that the trial court erroneously overruled City's objections to issue 6 for several reasons, including the contention that "as a matter of law, it was not a proximate cause, because no causal connection is shown between a tractor-mower with a gas cap that 'would permit' gasoline to leak . . . and the accident in question." No such objection was made to the submission of issue 6 and, in any event, the objection raises the question of no evidence to support the submission of the issue, rather than calling the court's attention to the omission of an issue.

■ Issues 4, 5 and 6 must be considered as, at the very least, a partial submission of one of plaintiff's theories of recovery. Thus, even if it can be reasonably argued that the answers to the issues actually submitted do not fortuitously include a finding that gasoline did, in fact, leak and become ignited, we may properly presume that, under Rule 279, Tex.R.Civ.P. (1967), the trial court impliedly made the required finding. 3 McDonald, Texas Civil Practice, Section 12.36.7 (1970 rev.).

We cannot accept City's contention that there is no evidence that the defect had existed for a length of time sufficient to enable City to discover and remedy it. There is evidence to the effect that mower no. 588 was leaking gasoline one week before the accident, three months before the accident and, according to the foreman, all mowers had been leaking gasoline for years, a condition about which the mower operators constantly complained. The evidence also supports the conclusion that no corrective action was ever taken, particularly as to mower 588.

■ We consider next the question of causation. The evidence certainly supports the conclusion that plaintiff was injured as the result of the ignition of gasoline. The defective cap created the danger of injury resulting from the ignition of leaking gasoline. There was a danger of fire and there was fire. There was danger of injury resulting from fire and there was injury resulting from fire. The injury, thus, resulted from fire traceable to the foreseeable risk created by the defect. The fact that the jury refused to find, in answer to issue 10, that the wiring was defective is irrelevant. There is evidence that in the course of the normal operation of the mowers sparks were emitted due to conditions other than defective wiring. There is evidence that, because of the location of the gasoline tank, leakage would result in the presence of uncovered gasoline near parts of the motor which, in the normal operation of the equipment would become hot enough to ignite such gasoline. We know of no rule which would require plaintiff to show the source of the spark or other ignitive agent which transformed the risk of fire and personal injury into actual fire and injury.

■ Since plaintiff's right to recover is supported by the answers to issues 4, 5, 6, 7, 8 and 9, the question of whether there is any evidence to support the answers to issues 1, 2 and 3 becomes irrelevant. The same is true of plaintiff's contention that there is an irreconcilable conflict between

the answer to issue 10 and the answers to the first three issues. In any event, the assertation of such a fatal conflict, embodied in City's point 7 was not included as an assignment of error in City's motion for new trial. Conflict of jury findings must be assigned as error in the motion for new trial. Barrow, Conflicts in Jury Findings, 26 Tex.B.J. 23, 81 (1963). Point 7 purports to be based on paragraph 42 of the motion for new trial which complains of the trial court's failure to grant City's motion to disregard the jury findings and to render judgment n. o. v. for City "for each of the reasons set forth in said Motion." This cannot be interpreted as even suggesting the existence of conflicting answers to special issues. Its reference to what is essentially a request that judgment be rendered for City despite the jury's findings is, in fact, misleading, since conflicting jury answers cannot form the basis for judgment for any party.

In support of its motion for judgment n. o. v., City argues that even if the findings relating to causal negligence find support in the evidence, it is entitled to judgment because the evidence conclusively establishes that plaintiff's injuries resulted from the negligence of his fellow-employees.

■■■ The fellow servant doctrine is clearly an affirmative defense. Rule 94, Tex.R.Civ.P. (1967). It was City's burden not only to plead the defense, as it did, but also to establish its component factual elements by a preponderance of the evidence. Since no issues referable to the defense were submitted, it was waived unless the evidence established its applicability as a matter of law.

City concedes that the duty of a master to exercise reasonable care to furnish his servants suitable machinery, equipment and appliances to enable the servants to perform their duties with reasonable safety is a nondelegable duty, and that where the master has breached this nondelegable duty the fellow-servant doctrine is not available to the master as a defense. *Fort Worth Elevators Company v. Russell*, 123 Tex. 128, 70 S.W.2d 397 (1934). However, City contends that the nondelegable duty rule is inapplicable here and that it is entitled to assert the defense under the "simple tool" exception to the nondelegable duty rule.

■■■ The question of whether a particular implement is a simple tool is a question of fact to be resolved by the factfinder. Thus, in *Pope v. St. Louis Southwestern Ry. Co. of Texas*, 106 Tex. 52, 155 S.W. 1175 (1913), it was said that the question of whether a chisel was or was not a simple tool was a question of fact. In *Kientz v. Carlton*, 245 N.C. 236, 96 S.E.2d 14, 20 (1957), in a case admittedly involving different facts concerning the cause of the injury, it was said that power mowers, despite their widespread use, could not be held to be simple tools as a matter of law.

■■■ Numerous cases involving the simple tool question are collected in 39 Words and Phrases "Simple Tool" pp. 420–27. However, little can be gained by summarizing these holdings. The determination does not depend exclusively on the circumstance that the implement happens to be of a simple character. A court must consider the capacity, intelligence and experience of the servant, the nature of the defect, knowledge of the defect by master or servant, opportunity of master and servant to discover the defect, the circumstances calculated to divert the servant's attention from the defect, etc. 53 Am.Jur.2d, Master and Servant, Section 189, p. 247.

It certainly cannot be said that the evidence establishes as a matter of law that plaintiff was experienced in the operation of tractor mowers. There is no evidence that plaintiff had knowledge of the defect. There is evidence supporting the conclusion that the master had actual knowledge of the defect. The evidence supports the conclusion that plaintiff did not have a reasonable opportunity to discover the defect, since there is testimony to the effect that the gasoline would not begin to leak until the equipment had been in operation 30 or

45 minutes, and the evidence discloses that at the time of the accident plaintiff had been operating the mower only about 30 minutes. At about the time that the leakage would have become observable, plaintiff's attention was diverted by the foreman and, in accordance with the foreman's instructions, plaintiff was operating the mower in reverse, looking to the rear. His attention, therefore, was diverted from the site of the defect, since the gasoline tank was located forward of the operator. City stresses the fact that a gasoline tank cap, which can be tightened simply by turning it by hand, is a simple tool as a matter of law, particularly in view of the fact that plaintiff had worked in gasoline stations and understood the functions of a gasoline cap and the manner of tightening it. In essence, the argument is that a gasoline cap is necessarily a simple tool. This theory would make the nature of the defect conclusive, and would necessarily lead to the conclusion that injury resulting from the explosion of a nuclear reactor is the result of a defect in a simple tool if the cause of the explosion was a loose screw which could have been tightened by the use of a simple screw driver. The nature of the defect is no more conclusive than is the nature of the machinery.

Under all the circumstances in this case, it cannot be said, as a matter of law, that plaintiff's injury resulted from a defect in a simple tool.

City's points 1, 4, 5, 6, 7, 8, 9 and 10 do not present reversible error.

We consider next City's claim that the award of $30,000.00 for impairment of future earning capacity is excessive. Point 11, which asserts that the answer to special issue 16(c), awarding $30,000.00 for loss of earning capacity in the future is excessive to the extent that it shows that it is based on passion, bias and prejudice, purports to be germane to paragraph 36 of City's motion for new trial. Point 12, contending that the answer to issue 16(c) is so contrary to the overwhelming weight and preponder-

ance of the evidence as to be manifestly wrong and unjust, is described as being germane to paragraph 37 of the motion for new trial.

Paragraph 36 states that the answers to 16(a), 16(b), 16(c) and 16(d) are each excessive. This assignment of error complains of four separate factual findings by the jury and appears to be multifarious. Paragraph 37 asserts that such answers are each so contrary to the overwhelming weight and preponderance of the evidence as to be manifestly wrong and unjust. This assignment is not sufficient to call the trial court's attention to the claim that the awards of damages are excessive. *Collins v. Smith*, 142 Tex. 36, 175 S.W.2d 407 (1943).

In any event, the claim of excessiveness cannot be sustained. The fact that plaintiff, at the time of trial, some five years and four months after the accident, was earning more as a City employee than he was earning at the time of the accident is certainly not decisive. The critical question is loss of earning capacity, rather than loss of earnings. *City of Houston v. Holden*, 336 S.W.2d 193 (Tex.Civ.App.— Eastland 1960, writ ref'd n. r. e.).

Plaintiff testified that as a result of his injuries he could no longer drive a truck or operative automotive equipment because of the severe pain in his legs. His legs were severely burned, and his superiors testified that he was not performing his work satisfactorily, due to excessive absenteeism. Plaintiff testified that his absences were due to the fact that the severity of the pain forced him to seek medical attention. Since his return to work following his injury, plaintiff has been assigned janitorial duties and, at times, clerical duties. There is expert testimony to the effect that in spelling and arithmetic plaintiff is able to perform only at a fourth grade level, so that in terms of earning capacity he is limited to earning his living as a laborer, either skilled or semi-skilled, not having the intellectual capacity to do bookkeeping, record-keeping, or other clerical duties such as filing or

**362**

filling out forms. There is medical testimony to the effect that, because of his injuries, plaintiff is unable to perform work requiring prolonged standing or walking for more than one or two hours at a time, and that he should avoid doing even work which required him to sit for long periods of time.

City relies on letters from doctors, addressed City officials, indicating that plaintiff refused to follow medical advice and that he was able to return to his normal duties. There is also testimony from City employees to the effect that plaintiff did not regularly change the bandages on his legs and often worked with dirty bandages or with his pajamas under his trousers. Both plaintiff and his wife testified that he followed the directives of his doctor.

 It is clear that the evidence concerning the impairment of plaintiff's earning capacity was in sharp conflict. This factual issue was properly submitted to the jury and the verdict resolved the issue in plaintiff's favor. In view of the evidence relating to the severity of plaintiff's injuries, his diminished capacity to perform physical labor (the only type of labor for which he is fitted in view of his limited education and intellectual ability), and the evidence concerning his unsatisfactory performance of the duties assigned to him after he returned to work following his injury, we cannot say that the award shows that it was the result of passion, prejudice or other improper motive, or that the amount awarded was not the result of a deliberate and conscious conviction in the minds of the jurors, or that the amount awarded is so excessive as to shock a court's sense of justice. *H. E. Butt Grocery Company v. Quick*, 442 S.W.2d 798 (Tex.Civ.App.—San Antonio 1969, writ ref'd n. r. e.).

Since we have concluded that the award was not excessive, City's point 12, asserting as error the failure of the trial court to order a remittitur, must be overruled.

The judgment of the trial court is affirmed.